USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-4-15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| DEBRA M. BRENNAN, | : | |
| | : | |
| Plaintiff, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| - against - | : | |
| | : | **13-CV-6338 (AJN)(RLE)** |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**To the HONORABLE ALISON J. NATHAN, United States District Judge:**

## I.  Introduction

Plaintiff Debra Brennan ("Brennan") commenced this action under the Social Security

Act  (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social

Security (the "Commissioner") denying her claim for disability insurance benefits.  On June 23,

2014, the Commissioner filed a motion for judgment on the pleadings to affirm her final decision

that Brennan is not disabled.  (Def.'s Mem. of Law in Supp. of Comm'r's Mot. for Judgment on

the Pleadings ("Def. Mot.") at 2.)  In response, on July 7, 2014, Brennan filed a motion for

judgment on the pleadings, asking the Court to overturn the final administrative decision finding

no disability and remand the case solely for a calculation of benefits or, alternatively, to remand

the case for reconsideration of the evidence.  Brennan argues that the record compels the

conclusion that she is disabled and does not have the residual functional capacity to perform her

past work.  (Pl.'s Reply Memo in Support of Mot. for Judgment on the Pleadings ("Pl. Mot.") at

9.)  For the reasons that follow, I recommend that Brennan's motion be **GRANTED IN PART**,

and that the case be **REMANDED** for further administrative proceedings.

## II. Background

### A. Procedural History

Brennan applied for disability insurance benefits on January 2, 2008. (Transcript of Administrative Proceeding ("Tr.") at 197.) The application was denied on February 25, 2008, *id.* at 117, and on March 3, 2008, Brennan requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 122.) On June 8, 2009, Brennan appeared before ALJ Dennis G. Katz with non-attorney representative Yemithsou Chery. (*Id.* at 57.) The ALJ issued a decision on July 28, 2009, finding that Brennan was not disabled under the Act, and was not entitled to disability insurance benefits. (*Id.* at 98-105.) Brennan requested review by the Appeals Council, which was granted on May 3, 2011, and the case was remanded. (*Id.* at 107.) Specifically, the Appeals Council asked the ALJ to address the inadequate evaluation of the treating physician's opinion and provide specific references to evidence in the record that supported the determination of Brennan's RFC. (*Id.*)

Brennan reappeared before ALJ Katz on August 8, 2011, with the same non-attorney representative. (*Id.* at 35.) The ALJ issued a decision on February 2, 2012, finding that Brennan was not disabled under the Act, and therefore, not entitled to disability insurance benefits. (*Id.* at 19-28.) Brennan again sought review by the Appeals Counsel, but the request was denied, and the ALJ's decision became the Commissioner's final decision. (*Id.* at 2-7.) Brennan filed this action on September 10, 2013, and it was referred to the undersigned on September 20, 2013. (Doc. No. 1-2)

### B. ALJ Hearing on June 8, 2009

#### 1. Brennan's Testimony

At the time of her hearing, Brennan was a 38 year-old mother of two. (*See* Tr. at 63, 67.) Before the onset of carpal tunnel syndrome in both hands, she worked for five years as an "end

of contracts rep [sic]" at an office equipment leasing company. (*Id.* at 62.) When she became pregnant with her first child, her hands "really started hurting and they were getting worse and worse. [She] couldn't hold a pencil, a pen. [She] couldn't type. [She] couldn't pick up the phone." (*Id.* at 63.) The symptoms continued after the baby was born and into her second pregnancy. (*Id.*) Beginning August 2, 1999, and thereafter, Brennan was unable to work because of her symptoms and received disability payments of $1,827 per month from her employer's insurance company. (*Id.* at 59-61.)

In 2001, Brennan underwent carpal tunnel release surgery, but was still feeling pain, numbness, and tingling in her hands. (*Id.* at 64 and 67.) Brennan's husband changed his schedule to accommodate her increased need for assistance. (*Id.*) He stayed home during the day and worked night shifts to care for their infant child. (*Id.* at 66.) Brennan could not hold a baby bottle or a cellphone long without dropping it, and was afraid of dropping her child. (*Id.* at 65.) Brennan's husband was responsible for household chores, including cooking, doing laundry, and grocery shopping. (*Id.* at 64-66.) When Brennan needed help and her husband was not home, his mother, who lived nearby, provided assistance. (*Id.* at 66.)

When driving to her twice weekly doctor's appointments, Brennan turns on the ignition holding the key with both hands. (*Id.* at 67 and 74.) Although she can tie her shoelaces, she wears pullover shirts to avoid buttoning anything. (*Id.* at 67-68.)

Although she is able to open her wallet, Brennan no longer goes grocery shopping because she is unable to take things off the shelves. (*Id.* at 68-69.) She is able to brush her teeth, but feels discomfort applying make-up and doing her hair. (*Id.* at 75.) Within the last ten years, Brennan's medications have frequently changed and have caused a variety of side effects, including nausea, dizziness, drowsiness, weakness, tightening of the chest, and diarrhea, which last anywhere from three to four hours, about twice a day. (*Id.* at 78-79.)

### 2. Vocational Expert's Testimony

Victor Alberigi, a vocational expert, testified by telephone. The ALJ asked Alberigi whether someone who could not use their hands "at all, for reaching, handling, or fingering," could do Brennan's past work, or any other work in the national economy. (Tr. At 80.) Alberigi responded that the hypothetical person would not be able to do any work, unless an employer provided adaptive equipment, which many are not willing to do. (*Id.* at 80-81.) The ALJ then asked Alberigi whether someone with the capacity to perform all three functions occasionally (only a third of the time in a typical workday) could hold a job in the national economy. Alberigi responded that a surveillance system monitor position was a sedentary job that only required occasional reaching, handling, and fingering. (*Id.* at 81-82) He also mentioned photo-finishing counter clerk and usher positions as jobs that only required occasional reaching, handling, and fingering. (*Id.* at 84, 86.)

Brennan's non-attorney representative, Yemithsou Chery, asked Alberigi whether, in addition to the limited ability of occasional reaching, fingering, and handling, an individual who was distracted from work for a total of three hours in a workday could hold a position. (*Id.* at 89.) Alberigi answered that such a person would not be able to hold a position. (*Id.*) Chery also asked whether the inability to carry and hold objects would affect the ability to perform the jobs listed. (*Id.*) Alberigi replied that, because the job of an usher was listed in the Department of Labor's Dictionary of Occupational Titles (DOT) as requiring carrying, pushing, and pulling up to twenty pounds approximately one-third of the workday, a person with such limitations could not do the job. (*Id.* at 90.) The ALJ countered that the usher position outside the DOT did not "seem to be a job where you'd be carrying much during the day except some programs perhaps." (*Id.*) Alberigi replied that as performed in the national economy, the job of an usher, and that of a photo-finishing counter clerk, required the ability to lift less than two pounds. (*Id.* at 90-91.)

4

### 3.  Medical Evidence

#### a.  Dr. Ira Neustadt, M.D.

On October 8, 1999, on a questionnaire sent to Brennan's health insurance, neurologist

Dr. Ira Neustadt diagnosed Brennan with bilateral carpal tunnel syndrome[1] caused by pregnancy

(due date in December 1999).  (Tr. at 312.)  Dr. Neustadt stated that Brennan's symptoms began

around July 30, 1999, and noted restrictions in the repetitive use of her hands because of pain

and swelling.  (*Id.*)  He indicated Brennan's work capacity as "none," and stated that it was

"indeterminate" when Brennan could return to work.  (*Id.*)

#### b.  Dr. Douglas J. Fauser, M.D.

On April 5, 2000, Brennan visited Dr. Douglas J. Fauser, a physician at Somers

Orthopaedic Surgery and Sports Medicine group, complaining of progression of the carpal tunnel

symptoms, more pronounced on the right hand than the left.  (Tr. at 346.)  Dr. Fauser noted that

Brennan had previously visited the emergency room for wrist splinting,[2] "which did not alleviate

her complaints."  Although Brennan's pain had reduced by 80%, she still presented marked

weakness. Dr. Fauser's examination revealed "no restriction of carpal range of motion, positive

Tinel[3] bilaterally, negative Phalen[4] bilaterally," marked weakness in grip strength and thumb

---

[1] Carpal tunnel syndrome is a condition in which there is excessive pressure on the median nerve. The median nerve is the nerve in the wrist that allows feeling and movement to parts of the hand. Carpal tunnel syndrome can lead to numbness, tingling, weakness, or muscle damage in the hand and fingers. *Carpal Tunnel Syndrome*, PUBMED HEALTH (April 1, 2013), http://ncbi.nlm.nih.gov/pubmedhealth/PMH0001469.

[2] Wrist splinting refers to the use of an appliance, either rigid or flexible, to support or protect weakened wrist muscles.  Dorland's Illustrated Medical Dictionary 1778-79 (31st ed. 2007).

[3] Tinel's maneuver is performed to produce carpal tunnel syndrome symptoms and is done by tapping the median nerve in the wrist. A positive test is found when the tapping causes worsening of the tingling in the fingers. A positive Tinel's sign is an indication of the syndrome.  Jonathan Cluett, *Carpal Tunnel Syndrome,* ABOUT HEALTH (Sept. 11, 2014), http://www.orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm.

[4] Phalen's maneuver is done by pushing the back of the hands together for one minute. This compresses the carpal tunnel to produce carpal tunnel syndrome symptoms. If the symptoms worsen when the maneuver is performed, it indicates a positive Phalen's sign. A positive Phalen's sign may be an indication of the presence of carpal tunnel syndrome.  A negative Phalen's sign indicates that the symptoms of the syndrome did not worsen when the maneuver was performed. However, the test is only indicative, not definitive, of the presence of the syndrome.  *Id.*

rotation that was equal bilaterally. (*Id.*) Side and diagonal x-rays of the wrist did not show the syndrome. (*Id.*) Dr. Fauser recommended a course of hand therapy, and if Brennan's hands showed no improvement within a month, he suggested carpal tunnel release surgery. (*Id.*)

On a follow-up visit on May 5, 2000, Dr. Fauser examined Brennan and concluded that there was no "significant change in her clinical condition." (Tr. at 345.) His examination revealed "a mildly positive Tinel sign, no negative Phalen," and a range of motion that was "minimally restricted." (*Id.*) Dr. Fauser recommended that Brennan continue hand therapy and a re-examination if the symptoms did not improve within four to five weeks. (*Id.*)

On June 26, 2000, Brennan saw Dr. Fauser and complained of symptoms in her left hand. (Tr. at 343.) Dr. Fauser found marked weakness and positive Phalen's and Tinel's signs on the left side, but not on the right. (*Id.*) Dr. Fauser recommended that Brennan continue therapy and have carpal tunnel release surgery in the fall. (*Id.*)

On September 18, 2000, Brennan complained to Dr. Fauser about pain, mostly in her left hand. (Tr. at 341.) Dr. Fauser found positive Tinel's and Phalen's signs in her left hand, but not in her right. (*Id.*) He noted that Brennan had "mild restriction of range of motion, [and] discernible pain along the entire volar[5] aspect of the forearm." (*Id.*) Dr. Fauser recommended carpal tunnel release surgery if continued therapy showed no improvement. (*Id.*)

On December 18, 2000, Dr. Fauser's examination of Brennan revealed progression of the carpal tunnel symptoms, now bilaterally (worse on the right than on the left). (Tr. at 339.) He noted that Brennan was not sleeping well and was unable to participate in a physical therapy program because of "severe pain" and "progressive weakness." (*Id.*) The pain originated in the wrist area closest to the palm, and radiated into the fingertips and up the forearms, producing

---

[5] "Volar aspect" refers to the palm or sole of the hand. Dorland's Illustrated Medical Dictionary 2099 (31st ed. 2007).

cramping and dysesthesia.[6]  (*Id.*)  Dr. Fauser's examination also revealed positive Tinel's and

Phalen's signs, worse on the right than on the left, and severe weakness of opposition and grip

strength bilaterally.  (*Id.*)  He recommended surgical release of the carpal tunnel and

postoperative physical therapy, and predicted a "protracted recovery due to the weakness

[Brennan had]."  (*Id.*)

On January 24, 2001, Brennan made an emergency visit to Dr. Fauser after carpal tunnel

release surgery.  (Tr. at 338.)  Two days earlier, Brennan's son had struck her right wrist,

"causing significant pain and a popping sensation in the wrist itself."  (*Id.*)  Dr. Fauser found that

Brennan was "clinically" doing well, though the incision had spread around the sutures, which

remained intact.  (*Id.*)  On January 29, he removed her sutures.  (Tr. at 336.)

On March 7, Dr. Fauser examined Brennan to see what progress had been made after the

carpal tunnel release surgery and found mild restriction of wrist range of motion, extensive

tenderness, and shoulder stiffness, though nerve function and blood flow in her wrist was intact.

(Tr. at 334.)  He noted that Brennan's prescription would be changed to two non-steroidal anti-

inflammatory drugs, as the large dose of ibuprofen she was taking was giving her an upset

stomach.  (*Id.*)  Dr. Fauser hypothesized that Brennan was developing "early causalgia (mild

reflex sympathetic dystrophy)"[7] on her right shoulder, and referred her to a neurologist for an

evaluation.  (*Id.*)

---

[6] "Dysesthesia" is the distortion of any sense, especially that of touch, or an unpleasant abnormal sensation produced by normal stimuli.  *Id.* at 584.

[7] "Causalgia" and "reflex sympathetic dystrophy" are complex regional pain syndromes.  *Id.* at 313 and 591. Complex regional pain syndromes are chronic pain syndromes of unknown cause.  Type 1 complex regional pain syndrome, also called reflex sympathetic dystrophy, often follows tissue injury, but without the presence of nerve injury and may be accompanied by posttraumatic osteoporosis. Type 2, also called causalgia, is associated with injury to nerves not related to the location where the pain is located.  *Id.* at 1851.

On April 27, Dr. Fauser reviewed Brennan's Electromyography[8] (EMG) evaluation and found "moderate right-side carpal tunnel, severe on the left." (Tr. at 332.) Brennan complained of "progressive dysfunction in the left hand... [and] a diminished range of motion [on both shoulders], more symptomatic on the right, with pain at rest and inability to perform activities which require repetitive overhead activities." (*Id.*) Dr. Brennan's examination revealed Brennan's range of motion in her shoulder was limited mildly and that she had "weakness of abduction,[9] with a firm end point."[10] (*Id.*) Her strength was at full capacity. (*Id.*) Dr. Fauser recommended continuation of physical therapy on Brennan's hands and shoulders, and referred her to a physiatrist about carpal release surgery on her left hand. (*Id.*)

In a questionnaire sent to Brennan's insurance on May 1, Dr. Fauser noted that Brennan could sit, walk, and stand for up to eight hours in an eight-hour day, but could not lift or carry any amount of weight. (Tr. at 348.) He also noted a limited use of Brennan's right hand and wrist. (*Id.*)

### c. Dr. Asadolah Baradaran, M.D.

Dr. Asadolah Baradaran, a neurologist, examined Brennan on April 2, 2001. (Tr. at 300) Brennan complained of numbness in her hands and pain in her wrists that radiated into her forearms, as well as pain and numbness in her right shoulder. (*Id.*) Dr. Baradaran performed a

---

[8] "Electromyography" is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. Dorland's Illustrated Medical Dictionary, 609 (31st ed. 2007).

[9] "Abduction" is the act of drawing away a limb from the middle of the body, or in the case of fingers, away from the middle of the hand. *Id.* at 2.

[10] "Firm end point" refers to the patient's ability to firmly stop the movement of limb as it is drawn away from the body. A firm end point indicates that the shoulder ligament is intact. When a ligament is torn, the end point is "soft" because the ligament does not abruptly stop the motion of the limb. Edward G. McFarland, EXAMINATION OF THE SHOULDER: THE COMPLETE GUIDE 171 (Thieme, 1st ed. 2006).

nerve conduction study that revealed delays in the distal latency[11] and conduction velocity[12] of the median (but not the ulner nerve[13]) in both hands. (*Id.*) EMG testing performed that day "failed to show sign[s] of denervation."[14] (*Id.*) Brennan showed "a Tinel sign and Phalen's sign in both sides... [and] slight diminished sensation" in the left hand. (*Id.*) She did not have any signs of muscle atrophy[15] or abnormal movement in her fingers. (*Id.*) Dr. Baradaran concluded that Brennan had carpal tunnel syndrome that was more severe in the left side and that surgery might be needed. He recommended therapy and splints for both hands. (*Id.*)

On June 17, 2003, Brennan revisited Dr. Baradaran complaining of pain in her wrists that radiated into her forearms. (Tr. at 302.) Dr. Baradaran performed a nerve conduction study and EMG testing and found a positive Tinel's sign and bilateral diminished sensation. (*Id.*) Dr. Baradaran concluded that Brennan had bilateral carpal tunnel syndrome that was more severe on the left side. (*Id.*) Compared to the study done on April 2, 2001, Dr. Baradaran found that "this study showed worsening of the carpal tunnel syndrome in both sides." (*Id.*)

### d. Dr. Nicholas Panaro, M.D.

On May 22, 2001, Brennan visited Dr. Nicholas Panaro complaining of weakness in both wrists (greater on the left) and numbness in her fingers, with discomfort between her elbow and shoulder on the left side, and discomfort from her right wrist down. (Tr. at 325.) Dr. Panaro noted that, although Brennan had previously been diagnosed with shoulder-hand syndrome,[16] she

---

[11] "Distal latency" refers to the time it takes for an electrical impulse from an electrode to travel through a nerve to another electrode. *Id.* at 1022. In this case, it refers to the time it took the electrical impulse to travel Brennan's median nerve, which is defined in footnote 1.

[12] The velocity of conduction refers to the speed at which the body is able to transmit a flow of electricity or heat. *Id.* at 408.

[13] The ulnar nerve is the nerve that travels from the shoulder to the hand. *Ulnar Nerve Dysfunction*, MEDLINEPLUS MEDICAL ENCYCLOPEDIA (Nov. 7, 2014), http://www.nlm.nih.gov/medlineplus/ency/article/000789.htm.

[14] "Denervation" is the desection or removal of the nerves. *Id.* at 493.

[15] "Atrophy" is the wasting away or diminution in the size of a cell, tissue, organ, or part. *Id.* at 177.

[16] "Shoulder-hand syndrome" is another name for reflex sympathetic dystrophy (see footnote 7), limited to the upper extremity. *Id.* at 1871.

had "no problems from that complaint." (*Id.*)  Brennan told Dr. Panaro that "Celebrex ha[d]

solved many of her problems," but that she had to take it daily, and feared overuse.  (*Id.*)  Dr.

Panaro's examination revealed that Brennan had full motor strength bilaterally and no signs of

atrophy of the shoulders, upper arms, forearms, or hands.  (Tr. at 326.)  Brennan had full finger

extension and bending, as well as full intrinsic muscle[17] and grip strength.  (*Id.*)  Both Tinel's

and Phalen's signs were negative, (Tr. at 327.), but EMG testing showed mild carpal tunnel

syndrome bilaterally.  (Tr. at 330.)

Dr. Panaro recommended magnetic resonance imaging (MRI) to determine the cause of

the pain and weakness, but found physical therapy unnecessary.  (*Id.*)  He also recommended that

Brennan purchase lightweight dumbbells to do a home strengthening program.  (*Id.*)

### e.  Dr. Neal H. Shuren, M.D.

On April 27, 2004, Dr. Neal H. Shuren, an orthopedic surgeon, evaluated Brennan.  (Tr.

at 371.)  His notes indicate that Brennan complained of the worsening of her symptoms even

though she had had carpal tunnel release surgery.  (*Id.*)  Dr. Shuren noted that numbness in

Brennan's hands occurred intermittently, worse in the morning and at night.  (*Id.*)  He mentioned

that the EMG done in 2003 showed carpal tunnel in both wrists that was worse compared to the

study done in 2001.  (*Id.*)

Dr. Shuren's physical examination revealed no swelling or deformities.  (Tr. at 371.)  E

Brennan did not have a positive Tinel's sign in the wrist, she did have a Tinel's sign over the

pronator[18] region and felt carpal tunnel syndrome symptoms when pressure was put on the carpal

---

[17] The hand has 19 "intrinsic" muscles, or muscles which begin and end only in the hand. *Reconstructive Hand Transplant Surgery*, JOHN HOPKINS MEDICINE (Mar. 2. 2015),
http://www.hopkinsmedicine.org/transplant/programs/reconstructive_transplant/hand_transplant_surgery.html

[18] The "pronator region" refers to the muscle that serves to turn the hand back (or down when the forearm is flexed). Dorland's Illustrated Medical Dictionary, 1549 (31st ed. 2007).

tunnel and pronator regions.  (*Id.*)  Dr. Shuren believed Brennan had a "double crush syndrome[19] with median nerve compression, both at the wrist and in the pronator region of the forearm." (Tr. at 372.)  He recommended left carpal tunnel release surgery and, if symptoms persisted, release of the median nerve in the pronator region in both shoulders.  (*Id.*)

In September 2004, Dr. Shuren performed left carpal tunnel release surgery on Brennan. (Tr. at 314.)  In a follow-up visit on September 28, her wound was slightly swollen and irritated, and there was "a little restriction in finger motion."  (Tr. at 370.)  Brennan was neurologically intact, (*Id.*), and Dr. Shuren recommended a course of therapy.  (*Id.*)

In a follow-up visit on October 26, Brennan continued to complain of discomfort around her forearm "with all activities," and a sharp pain in the thumb, ring, and small fingers.  (Tr. at 369.)  Dr. Shuren indicated that Brennan "[had] not really seen any improvement in her symptoms" despite going to therapy once a week in the preceding month. (*Id.*)

Dr. Shuren's physical examination revealed tenderness around the forearm musculature, over the pronator region and the muscle that extends the joints. (Tr. at 369.)  Brennan's injury had healed well, and Dr. Shuren noted good wrist and finger motion.  (*Id.*)  Dr. Shuren hypothesized that Brennan's pain was caused by "some soft tissue overuse," but recommended doing blood tests because he could not rule out the possibility of an underlying inflammatory

---

[19] "Double crush syndrome" is a medical hypothesis that most patients with carpal tunnel syndrome not only have compression at the wrists, but also show damage to cervical nerve roots, which explains why patients have pain in the forearm, elbow, upper arm, shoulder, chest, and upper back. The hypothesis also purports to explain failed attempts at surgical repairs when neither surgery nor carpal tunnel diagnosis appear faulty.  Brent S. Russell, *Carpal Tunnel Syndrome and the "Double Crush" Hypothesis: A Review and Implications for Chiropractic*, BIOMED CENTRAL 1 (Apr. 21, 2008), http://www.biomedcentral.com/content/pdf/1746-1340-16-2.pdf.

condition.  (*Id.*)  He also recommended the continuation of therapy, in addition to "iontophoresis[20] and ultrasound." [21]  (*Id.*)

On December 28, 2004, Brennan complained of "discomfort in the forearm radiating down into the thumb, ring, and small fingers." (Tr. at 368.)  Despite intermittent therapy, she had "not seen any improvement in her symptoms." (*Id.*)  Dr. Shuren's physical examination revealed that Brennan experienced continued discomfort "along the volar forearm over the pronator region, which reproduce[d] symptoms into the hand." (Tr. at 368.)  He found no "irritability around the cubital tunnel[22] or the median nerve at the wrist," (*Id.*), and recommended six months of continued therapy before any further surgery. (*Id.*)

On January 25, 2005, Brennan visited Dr. Shuren for a follow-up appointment, still complaining of "pain on both the radial and ulnar aspects of the hand." (Tr. at 367.)  Although there was no numbness, Brennan continued to experience weakness and drop things. (*Id.*)  Dr. Shuren's physical examination noted no irritability over the wrist, though Brennan had some discomfort around the wrist joint and continued "irritability over the pronator region." (*Id.*)  Radiographs taken that day were normal, but Dr. Shuren set Brennan up for EMG testing to "reassess the pronator region." (*Id.*)

On May 24, 2005, Brennan's EMG "showed a definitive improvement from before her carpal tunnel." (Tr. at 366.)  Her bloodwork and X-rays were deemed normal. (*Id.*)  She had undergone back therapy, which she felt did not help her arms. (*Id.*)  Dr. Shuren's physical examination showed no swelling or deformities, and her wrist and finger motions were

---

[20] "Iontophoresis" is the introduction of ions of soluble salts by means of electrical currents into the tissues of the body, often for therapeutic purposes.  Dorland's Illustrated Medical Dictionary, 972 (31st ed. 2007).

[21] "Ultrasonography" refers to the visualizations of deep structures of the body by recording echoes of pulses of ultrasonic waves directed into the tissues.  *Id.* at 2027.

[22] The "cubital tunnel" refers to the opening between two ends of an arm muscle through which the ulnar nerve (defined in footnote 12) enters the forearm.  *Id.* at 2018.

"excellent." (*Id.*) He noted that she had discomfort along the volar forearms and wrist when he applied pressure and that the "Tinel's test cause[d] shooting pain into the hand, but no numbness." (*Id.*) Motor strength was also intact. (*Id.*) Dr. Shuren was unsure of what caused the inflammation, but hypothesized that Brennan was experiencing "some very bad volar wrist flexor tendonitis."[23] (*Id.*) He injected cortisone into the right carpal canal "to see if [it] would help with the tendonitis." (*Id.*)

On July 26, 2005, Brennan stated that she had a 20-30% improvement of her symptoms with the cortisone injection. (Tr. at 365.) She continued to complain of "pain in the volar aspect of the wrist and hand without any associated numbness or tingling." (*Id.*) Dr. Shuren noted that Brennan's bloodwork was still negative, but she did not seem to respond well to therapy or anti-inflammatories. (*Id.*) A physical examination continued to reveal "discomfort all along the volar wrist and fingers. Tinel's and carpal tunnel compression testing cause[d] pain, but not any numbness." (*Id.*) Dr. Shuren was "unclear" on other possible treatments, and recommended that Brennan see a rheumatologist for an evaluation. (*Id.*)

On November 16, 2005, Dr. Shuren examined Brennan after her evaluation by a rheumatologist. (Tr. at 364.) His notes indicated that the rheumatologist believed Brennan's symptoms were "related to recalcitrant carpal tunnel," and another EMG was conducted, which suggested "ulnar nerve compression at the elbow at best." (*Id.*) Brennan continued complaining of symptoms in both hands. (*Id.*) A physical examination did not show any discomfort on range of motion or reproduction of symptoms, though Brennan still had active Tinel's signs in both wrists, which caused more pain than numbness. (*Id.*) Dr. Shuren commented that Brennan's

---

[23] Tendonitis (also spelled tendinitis) is the inflammation of tendons and of tendon muscle attachments. *Id.* at 1904.

blood work, EMGs, and X-rays had all been normal. (*Id.*) He nevertheless recommended an MRI of her right wrist "to rule out any intrinsic process," and an MRI of her spine. (*Id.*)

### 4. ALJ Dennis G. Katz's Findings

On July 28, 2009, ALJ Dennis G. Katz issued a decision stating that Brennan was not disabled under §§ 216(c) and 223(d) of the Social Security Act at any time from August 2, 1999, through December 31, 2005, the last date insured. (Tr. at 105.) Although the ALJ found that Brennan had the severe impairment of carpal tunnel syndrome, he found that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 101.)

To support his conclusion, the ALJ noted that Dr. Shuren found no abnormalities or visible atrophy of the hands in an MRI of Brennan's wrists, "which would be apparent if there was the total debilitation alleged," and that Brennan's medical records showed she had adequate grip strength, (*Id.* at 103.), although she consistently reported bilateral hand symptoms and still had active Tinel's involvement in her wrists.

The ALJ found that Brennan's medical record did not support the "allegations that she was rendered homebound by her impairments and the adverse side effects of her medications." (*Id.* at 103.) Specifically, the ALJ found that treating physician Dr. Shuren's records did not support Brennan's testimony at the hearing that she could not grasp "anything" and had lost effective use of both her hands. (*Id.* at 102.) Although Dr. Shuren did not quantify Brennan's loss of use, the ALJ gave his own opinion that she had "most probably" lost the use of 50% of her ability for fingering and handling and would "most likely" be limited to lifting and carrying objects weighing five pounds on a frequent basis, and objects weighing ten pounds on an occasional basis. (*Id.*) Additionally, because Brennan had not reported any adverse medication interactions to her physicians, and had not reported a total inability to use her hands, he

concluded that the medical record did not support her allegations at the hearing. (*Id.* at 102-103.)
The ALJ concluded that through the last day insured, Brennan had the residual functional
capacity (RFC) to perform light work as defined in 20 C.F.R. 404.1567(b), except that she could
only use her hands for reaching, fingering, and manipulations 50% of the time during a typical
workday. (*Id.* at 105.)

### 5. Appeals Council Review

On May 3, 2011, Administrative Appeals Judge Robert M. Goldberg granted Brennan's
request for review of the ALJ's decision. (Tr. at 108.) The Appeals Council remanded the case
because the ALJ failed to provide an adequate evaluation of treating physician Dr. Fauser's
opinion and failed to provide sufficient evidence for his finding of Brennan's RFC. (*Id.* at 107.)

The Appeals Council ordered that, upon remand, the ALJ had to give further
consideration to Brennan's maximum RFC and provide a rationale with specific reference to the
record in support of the assessed limitations. (*Id.*) In doing so, the ALJ was ordered to evaluate
the treating source opinion pursuant to 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p
and 96-5p, and explain the weight given to the opinion. (*Id.*) If appropriate, the ALJ could
request additional evidence or further clarification of the opinion from the treating source. (*Id.* at
108.) The ALJ could also obtain supplemental evidence from a vocational expert, if warranted,
to clarify the effect of the assessed limitations on Brennan's occupational base by using
hypothetical questions that reflected Brennan's specific capacity or limitations, as established by
the record. (*Id.*)

### C. ALJ Hearing on August 8, 2011

#### 1. Brennan's Testimony

On August 8, 2011, Brennan reappeared before ALJ Katz with non-attorney
representative Yemithsou Chery. (Tr. at 35.) Since the last hearing, Brennan had not worked,

15

but was receiving monthly disability benefits from a private insurance company. (*Id.* at 37.) At the time of the hearing, Brennan was seeing Dr. Sodha, an orthopedic doctor, and Dr. Rudnick, [24] for pain management. (*Id.* at 42.) She was also taking an array of medications for pain. (*Id.*)

From August 19, 1999, through December 31, 2005, the period being examined to determine her disability status, Brennan was only able to use her hands in fifteen-minute increments before the pain in her hands prevented her from further using them. (*Id.* at 42.) In 2000, Dr. Fauser performed carpal tunnel release surgery on her right hand, and in 2004, Dr. Shuren did the same on her left hand. (*Id.* at 40.) Despite the surgeries, the carpal tunnel was still visible in an EMG test, and Brennan continued to have symptoms. (*Id.* at 41.)

### 2. Vocational Expert's Testimony

Julie Andrews, a vocational expert, testified during the hearing via telephone. (Tr. at 43.) Andrews stated that she was unable to open a disk sent by the ALJ describing Brennan's past relevant work but, based on Brennan's testimony, she concluded that Brennan was a contract specialist, which was listed in the DOT as a highly-skilled sedentary position with light exertion because of the constant arm movements. (*Id.* at 44-46.) The ALJ inquired whether a person with the same age, education, and work experience as Brennan, and with the ability to sit, stand, and walk for eight hours a day, and lift ten pounds occasionally and five pounds frequently, but with the ability to perform fine manipulations only 50% of the time, would be able to perform Brennan's past work. (*Id.* at 47.) Andrews testified that such a hypothetical person would not be able to perform Brennan's past relevant work. (*Id.*) She further stated that such a hypothetical person could only perform the duties of a surveillance system monitor and provided statistics for the Long Island/New York City Region. (*Id.* at 48, 53.) The ALJ informed Andrews that the

---

[24] The record does not provide Dr. Rudnick's concentration within the medical field.

region Brennan resided in was considered the Hudson Valley/Orange County/Rockland County area. (*Id.* at 53.) The ALJ noted that Andrews was not fully prepared to testify and concluded the hearing. (*Id.* at 51.) He asked that Andrews look into jobs that required fine manipulations and fingering half of the time, as well as one third of the time, and send him a report on what she found. (*Id.* at 51-52.) Accordingly, the ALJ postponed questions for Andrews by Brennan's representative for a later hearing. (*Id.* at 53.) Andrews sent the ALJ an email stating that, based on Brennan's past relevant work experience as a contract specialist, and the ability to perform less than occasional fingering and fine manipulations, the hypothetical person could work as a security guard, gate guard, receptionist, or information clerk. Andrews provided national and Hudson Valley region statistics. (*Id.* at 288.) The ALJ did not convene a follow-up hearing and did not provide Brennan with a copy of the report before rendering his decision.[25] (*Id.* at 31.)

### 3. ALJ Katz's Findings on Remand

On February 2, 2012, ALJ Katz issued a decision finding that Brennan was not disabled under §§ 216(c) and 223(d) of the Social Security Act at any time from August 2, 1999, through December 31, 2005, the last date insured. (Tr. at 20.) He found that Brennan had not engaged in substantial gainful activity during the period between the onset of the impairment through the date she was last insured. (*Id.* at 21.) He also found that, although Brennan did have the severe impairment of carpal tunnel syndrome, it did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Katz found that, despite Brennan's severe impairment, she retained the RFC to perform sedentary work and some light exertion level work. (*Id.*) Specifically, Katz found that Brennan could: (1) lift and carry items weighing ten pounds occasionally and five pounds frequently; (2)

---

[25] Brennan asserts that there was no follow-up hearing and that she did not receive a copy of the report. The Commissioner does not argue otherwise and the Court assumes that Brennan is correct.

stand, walk, and sit for up to and including eight hours per eight-hour workday; and (3) perform

fine manipulations and handling 50% of the time during a typical workday. (*Id.* at 22.) He

assigned no evidentiary weight to treating physician Dr. Fauser's opinion of Brennan's disabled

status, though he interpreted "the doctor's evaluation of 'limited use' as a 50% loss of use of

fingering/handling bilaterally." (*Id.* at 24-25.)

Katz did not find Brennan's statements of her disability credible because he found the

medical record lacked indications of atrophy in Brennan's hands. (*Id.* at 25.) He stated that

"none of [Brennan's] treating physicians ha[d] reported specific limitations in physical

functioning on and prior to the date last insured." (*Id.*) He further commented that, because

Brennan received long-term disability benefits from her insurance company, this "could have

served as a disincentive to work outside the home (where she has been a 'stay at home' mom)."

(*Id.* at 26.) Based on Andrews's email, and Brennan's limitations, age, education, and

transferable skills, Katz concluded that Brennan retained the RFC to work as a surveillance

systems monitor, security guard, gate guard, receptionist, or information clerk, which did not

require more than occasional fingering/handling ability. (*Id.* at 27.)

### 4. Appeals Council Review

On July 5, 2013, Administrative Appeals Officer Steven Kiviat denied Brennan's request

for review of Katz's decision, thus making it the Commissioner's final decision. (Tr. at 2-4.)

### III. Discussion

### A. Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3).

Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault*

*v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v.*

18

*Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). The ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B.  Determination of Disability

### 1.  Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant

is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-part process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has

"discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In determining whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se*

claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3. The ALJ did not apply the correct legal principles.

#### a. The ALJ failed to fully evaluate treating physician Dr. Fauser's opinion.

The ALJ improperly analyzed the medical source opinion pursuant to 20 C.F.R. §

404.1527 and gave no weight to treating physician Dr. Fauser's opinion.  In discrediting Dr.

Fauser's opinion, the ALJ found that Dr. Fauser's commentary on Brennan's disability was not a

medical opinion, but rather "a highly conclusory opinion of a person who is not a vocational

expert."  (Tr. at 24.)

The Social Security Administration (SSA) defines medical opinions as "statements from

physicians and psychologists or other acceptable medical sources that reflect judgments about

the nature and severity of [the] impairment(s), including symptoms, diagnosis and prognosis,

what [claimants] can still do despite impairment(s), and physical or mental restrictions." *See* 20

C.F.R. § 404.1527(a)(2).  Dr. Fauser's opinion included what were, in his medical judgment,

Brennan's limitations in the use of her hands.  (Tr. at 348.)  Specifically, Dr. Fauser noted that

Brennan could sit, walk, and stand for eight hours a day, but could not lift anything and had a

limited use of her right hand and wrist.  (*Id.*)  Dr. Fauser stated that the basis of his opinion came

from the carpal tunnel surgery he performed on Brennan's right hand earlier in the year.  (*Id.*)

His judgment constitutes a "medical opinion" under the SSA's definition.

In determining that Dr. Fauser's opinion merited no weight, the ALJ pointed to the

opinion's lack of reference to EMG testing performed on Brennan, and concluded that the

opinion was not supported by medically acceptable clinical and laboratory techniques.  (*Id.* at

24.)  Additionally, the ALJ found that Dr. Fauser's opinion was inconsistent with other medical

evidence in the record.  (*Id.*)  A treating physician's opinion merits controlling weight if it is well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2).

25

When a treating physician is not accorded controlling weight, the ALJ must determine how much weight to give the opinion by considering several factors, including (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6). Lack of specific clinical findings in the physician's treating report, standing alone, does not justify the ALJ's failure to credit the physician's opinion. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996)). The ALJ used the "well-supported by clinical techniques" standard when, in fact, that standard is used to determine whether the opinion merits controlling weight. Even in the absence of "clinical support," the treating physician's opinion can be afforded some weight. Furthermore, the ALJ focused solely on Dr. Fauser's opinion rendered on May 1, 2001, and did not acknowledge all of Dr. Fauser's reports during the year Brennan was under his care and their consistency with the entirety of the record. (Tr. at 24-26.) By failing to consider these factors in determining the weight to give Dr. Fauser's opinion, the ALJ misconstrued and misapplied the legal standard.

Additionally, the ALJ failed to provide "good reasons" for discrediting Dr. Fauser's opinion. Even if the ALJ found the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Fauser *sua sponte. Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998); *see also Perez,* 77 F.3d at 47 ("[T]he ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel . . . "); *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) ("An ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (citing *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999)). The ALJ's conclusory

explanation in this case, therefore, does not satisfy the "good reasons" standard. *See Gunter,* 361

Fed. Appx. 197, 199.

Notwithstanding the ALJ's failure to solicit further information from Dr. Fauser regarding

the basis of his medical opinion rendered on May 1, 2001, Brennan provided such additional

medical evidence that corroborated this opinion. On October 8, 1999, Dr. Neustadt sent an

evaluation to Brennan's insurance carrier that noted restrictions in the repetitive use of her hands

because of pain and swelling. (*Id.* at 312.) Dr. Neustadt indicated Brennan's work capacity as

"none," and that it was "indeterminate" when Brennan could return to work. (*Id.*) Although an

EMG study supported Dr. Neustadt's report, the ALJ also refused to give it any evidentiary

weight because it "did not set forth specific limitations in the claimant's ability to use her

hands." (*Id.* at 24.) If the ALJ found that Dr. Neustadt's report lacked Brennan's specific

limitations, and this information was required to evaluate the record, he had an affirmative duty

to fill this gap. *See Perez,* 77 F.3d at 47.

Dr. Baradaran also supported Dr. Fauser's opinion. On June 17, 2003, Dr. Baradaran

performed a nerve conduction study and EMG testing, and found that Brennan had bilateral

carpal tunnel syndrome, more severe on the left side. (*Id.* at 302.) Compared to an EMG done

earlier, Dr. Baradaran stated, "this study showed worsening of the carpal tunnel syndrome in

both sides." (*Id.*) The ALJ acknowledged this finding, but put more emphasis on the lack of

denervation and atrophy in the EMG, and Dr. Barandaran's failure to provide specific limitations

as to Brennan's physical functioning as a justification for dismissing the opinion. (*Id.* at 25.) By

unreasonably minimizing Dr. Barandaran's opinion that corroborated Dr. Fauser's opinion, the

ALJ mischaracterized evidence in the record. In evaluating the record, the ALJ may not ignore

or mischaracterize evidence of a person's alleged disability. *See Ericksson,* 557 F.3d 79, 82-84.

Considering Dr. Fauser's opinion was a medical opinion under the SSA definition, and the

opinion was not inconsistent with other substantial evidence in the record, both reasons relied upon by the ALJ for discounting Dr. Fauser's opinion were invalid. Thus, the Commissioner's failure to provide "good reasons" for giving no weight to Dr. Fauser's medical opinion constituted legal error.

### b. The ALJ improperly relied on a vocational expert's post-hearing report.

In determining that Brennan could perform jobs in the national economy, the ALJ relied on a report emailed to him by a vocational expert after the second hearing. (Tr. at 288.) Relying on this email, the ALJ concluded that a hypothetical person with Brennan's past work experience as a contract specialist, and the ability to perform less than occasional fingering and fine manipulations, could work as a security guard, gate guard, receptionist, or information clerk. (*Id.*)

Where a hearing is held, the Secretary's decision must be based on evidence adduced at the hearing, 20 C.F.R. § 416.1441, subject to certain exceptions. *Gullo v. Califano,* 609 F.2d 649, 650 (2d Cir.1979). Because Social Security disability benefits are statutorily created property interests protected by the Fifth Amendment, disability benefits claimants have a right to cross-examine the author of an adverse report and to present rebuttal evidence. *See Townley v. Heckler,* 748 F.2d 109, 114 (2d Cir. 1984). No supplemental hearing was held for Brennan, even after she had hired an attorney who questioned the ALJ's failure to provide the opportunity to cross-examine. (Tr. at 295.) This error was compounded when the vocational expert's hearing report was not forwarded to Brennan, her representative at the hearing, or the attorney she later hired. The ALJ's use of this report at step five violated 20 C.F.R. § 416.1441 and Brennan's due process rights to cross-examine the vocational expert, review the report, and present rebuttal evidence.

4.  **The ALJ's decision is not supported by substantial evidence in the record.**

   a.  **The ALJ failed to evaluate all of the relevant evidence to determine Brennan's RFC.**

In determining Brennan's RFC, the ALJ failed to assess all of the relevant evidence in the record pursuant to 20 C.F.R. § 404.1545. The ALJ gave no evidentiary weight to Dr. Fauser's medical opinion about Brennan's "disability." (Tr. at 25.) In contrast, the ALJ relied only on that same opinion and disregarded the rest of the record in determining Brennan's RFC. (*Id.*) This was error.

The ALJ is required to consider all of the factors set out in 20 C.F.R. § 404.1527 to determine what weight to assign to any medical opinion. In this case, the ALJ gave no weight to Dr. Neustadt's assessment that Brennan had no work capacity, *id.* at 312, or to Dr. Baradaran's finding that Brennan's carpal tunnel had worsened between 2001 and 2003, *id.* at 302. He asserted that these opinions did not set forth specific limitations on Brennan's ability to use her hands and that EMG testing did not show signs of denervation. (*Id.* at 24.) The ALJ did not, however, refer to the specific factors required to determine the weight given to medical evidence, including the nature and extent of the treatment relationship, the length of the treatment relationship, and the frequency of examination. (*Id.*) In addition, the ALJ did not set forth the factors considered or the weight given to Dr. Shuren's opinion, despite the fact that his opinion covered a year and a half of Brennan's relevant medical history and included the carpal tunnel surgery done on her left hand. (*Id.* at 23.) The ALJ merely concluded that the medical evidence did not support a finding of the symptoms alleged. (*Id.* at 25.)

Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making the findings on which his ultimate decision rests, and to address all pertinent evidence. *Calzada,* 753 F. Supp. 2d 250, 269. The crucial factors in any determination must be set forth

with sufficient specificity to enable the reviewing court to decide whether the determination was supported by substantial evidence, and the ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error. *Id.* This resulted in the erroneous exclusion of the opinions of Brennan's doctors.

The ALJ did not give Brennan's testimony any weight in his determination of her RFC because he did not find that her statements regarding her "homebound status" or her "**total inability** to use her hands" credible. (Tr. at 25.)(emphasis in original) Specifically, the ALJ referred to Brennan's testimony during the hearings in which she said it was "impossible" for her to use her hands "**at all**." (*Id.* at 22.) (emphasis in original) The ALJ concluded that Brennan's "facially absurd contentions" were not corroborated by the treating record, *id.,* and speculated that the disability payments Brennan received from her employer's insurance "could have served as a disincentive to work outside the home." (*Id.* at 26.)

In evaluating the relevant evidence in a claimant's record, an ALJ may not mischaracterize evidence of a person's alleged disability. *Ericksson,* 557 F.3d 79, 82-84. During the first hearing, Brennan testified that she could not hold a baby bottle or a cell phone for long without dropping it and was afraid of dropping her child. (Tr. at 65.) She also testified that when driving to her doctor's appointments, she used both hands to turn the key in the ignition. (*Id.* at 74.) Although she could tie her shoelaces, she wore pullover shirts to avoid having to button anything. (*Id.* at 67-68.) Brennan testified that she no longer went grocery shopping because she was unable to take things off the shelves, though she was able to open her wallet. (*Id.* at 68-69.) She testified she could brush her teeth, but felt discomfort when applying make-up and doing her hair. (*Id.* at 75.) At the second hearing, Brennan clarified that she was only able to use her hands in fifteen-minute increments before the pain in her hands prevented her from further using them. (*Id.* at 42.) A fair reading of the phrase "at all" in the context of

Brennan's entire testimony was that it was not meant to be literal. She merely described the limitation in the use of her hands since the onset of the carpal tunnel syndrome symptoms. The ALJ improperly misconstrued Brennan's statements regarding the use of her hands, and determined that her "facially absurd contentions" deserved no weight in his determination of the RFC. (*Id.* at 22.)

The ALJ improperly excluded relevant medical and other evidence, and relied solely on Dr. Fauser's May 2001 opinion to determine Brennan's RFC. In so doing, the ALJ failed to assess all relevant evidence, and thus, his determination was not supported by substantial evidence in the record. *See* 20 C.F.R. § 404.1545(3); *see also Zabala,* 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand).

### b. The ALJ relied upon an undeveloped vocational expert report to determine that Brennan was not disabled.

The ALJ ended Brennan's second hearing because the vocational expert was not adequately prepared for the proceeding, but indicated that Brennan's representative would be allowed to cross-examine the expert once the expert had the information readily available. (Tr. at 53.) However, in determining that there were jobs in the national economy that Brennan could still perform, the ALJ based his finding on an email sent by the vocational expert after the hearing. (*Id.* at 27.) No additional hearing was ever held. This email stated that there were jobs in the national economy that would allow Brennan to use her past relevant work experience as a contract specialist, and to apply her computer, analytical, people, telephone, office, and data entry skills. (*Id.* at 288.) Additionally, the vocational expert noted in her email that she had taken into consideration the fact that Brennan had no limitations in sitting or standing and had the ability to lift and carry five pounds frequently and ten pounds occasionally. (*Id.*) The vocational expert also noted that she limited her search of jobs that required no more than

31

occasional fingering and fine manipulations. (*Id.*)   Given these parameters, the vocational

expert concluded that Brennan could perform the responsibilities of a security guard, gate guard,

receptionist, or information clerk - jobs which were located in the "Hudson Valley Region."

(*Id.*) During the first hearing, the vocational expert had provided information for jobs in the

"Poughkeepsie, Newburg, and Middletown" area, which included Brennan's location, Orange

County. (*Id.* at 87-88.) It is unclear in the record whether the "Hudson Valley Region" is

separate and distinct from the "Poughkeepsie, Newburg, and Middletown" area or whether the

"Hudson Valley Region" encompasses the area in which Brennan lives. Neither Brennan nor her

representative had the opportunity to cross-examine the vocational expert at the second hearing

to verify that the region used by the vocational expert was appropriate.

A vocational expert may testify, based on a hypothetical question, to the existence and

numbers of jobs in the national economy that a claimant with a particular RFC can perform. 20

C.F.R. § 416.966. Neither Brennan nor her representative had the opportunity to cross-examine

and present evidence that would have provided more information for the vocational expert to

take into consideration when researching available jobs Brennan could perform. Thus, when

providing the ALJ with specific jobs in the economy that a person with Brennan's age,

education, skills, and RFC could perform, the vocational expert relied solely on the ALJ's

unsupported determination of Brennan's RFC. (Tr. at 47.) Although the vocational expert

provided a list of jobs in the Dictionary of Occupational Titles that fit the ALJ's description, the

ALJ's determination of Brennan's RFC was not based on substantial evidence in the record. The

vocational expert's testimony is only useful if it addresses whether the particular claimant, with

her limitations and capabilities, can realistically perform a particular job. *Aubeuf v. Schweiker,*

649 F.2d 107, 114 (2d Cir. 1981). The ALJ failed to provide an RFC that described Brennan's

limitations and capabilities and Brennan herself was unable to question the vocational expert's

findings. Therefore, the jobs cited by the vocational expert do not constitute substantial evidence in support of the ALJ's determination.

### 5. The Case Should Be Remanded for Further Administrative Proceedings.

Brennan requests a judgment on the pleadings or, alternatively, for the Court to remand the case for reconsideration of the evidence. (Pl. Mot. at 1.) A court should order remand to determine payment of benefits only where the record contains "persuasive proof of disability" and remand for further evidentiary proceedings would serve no further purpose. *Schall v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Remand for further administrative proceedings is appropriate "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). As discussed above, the ALJ failed to supplement the gap he acknowledged in Brennan's administrative record (the basis of Dr. Fuaser's medical opinion) and applied the wrong legal standards. Thus, the record supports the finding that further evidentiary proceedings would serve a purpose and a remand solely for calculations of the benefits is not warranted. The case should be remanded for a supplemental hearing to further develop the record and to reassess Brennan's RFC in accordance to SSA regulations.

## IV. Conclusion

For the reasons set forth above, I recommend that the Commissioner's motion be **DENIED** and the case **REMANDED** for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the vocational expert's recommended disposition to file written objections to this Report and Recommendation. Such objections will be filed with the Clerk of the Court and served to all adversaries, with extra copies delivered to the chambers of the Honorable Alison J. Nathan, 40 Foley Square, Room 906, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas c. Arn*, 474 U.S. 140, 149-150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)(c) (West Supp. 1995); Fed. R. Civ. P. 72(a), 6(a), 6(d).

**DATED: March 4, 2015**
**New York, New York**

**Respectfully Submitted,**

The Honorable Ronald L. Ellis
United States Magistrate Judge